ORIGINAL

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>SANDRA RIOS and<br>GARY DIDIO | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>17 MJ 02786 |

Complaint for violation of Title 42, United States Code, Section 1320A-7b(b)(1)(A)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>September 18, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT

NOV - 6 2017

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[42 U.S.C. § 1320a-7b(b)(1)(A)]

On or about September 18, 2017, in Los Angeles County, within the Central District of California, defendants SANDRA RIOS and GARY DIDIO, together with others known and unknown, knowingly and willfully received remuneration, that is, approximately $10,000, in the form of a cash payment, in return for referring individuals for laboratory diagnostic services for which payment could be made in whole and in part under a Federal health care program, namely Medi-Cal.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>JEREMY THORNTON |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – HHS OIG |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<br>SUZANNE H. SEGAL | DATE<br>November 6, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Michael G. Freedman x0631          REC: Detention

## AFFIDAVIT

I, Jeremy Thornton, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for SANDRA RIOS ("RIOS") and GARY DIDIO ("DIDIO") for receiving illegal kickbacks for the referral of beneficiaries of a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

### II.   BACKGROUND FOR HHS-OIG SPECIAL AGENT JEREMY THORNTON

2.   I have been employed as a Special Agent for the US Department of Health & Human Services, Office of Inspector General ("HHS-OIG") since January 2011, and am currently assigned to the Los Angeles Regional Office.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and make arrests for, federal felony offenses.

3.   I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the HHS-OIG Special Agent Basic Training Program, which concentrated specifically on health care fraud investigations.  My duties include investigating fraud,

waste, and abuse related to the 300-plus programs that fall under the Department of Health and Human Services ("HHS"), with the majority of time spent on health care fraud investigations. I have received training from the Federal Bureau of Investigation ("FBI"), HHS, and the National Healthcare Anti-Fraud Association focused on health care fraud.  I have assisted in the application for, and execution of, federal search and arrest warrants, and have testified before a federal grand jury. As a result of my training and experience, I am familiar with common health care fraud schemes and federal laws relating to health care fraud, including kickback schemes.

4.   I am familiar with the facts and circumstances of this investigation.  I make this affidavit in part based on personal knowledge derived from my participation in this investigation, and in part based upon information obtained from my training and experience; information I obtained from law enforcement personnel and witnesses; and federal health care program claims data.

5.   This affidavit includes summary descriptions of consensually recorded conversations.  These summaries are based on my review of the recordings, draft transcripts, interviews with cooperating sources, my experience as a law enforcement officer, information from other law enforcement officers in this investigation, as well as information I have learned as a result

of the investigation to date.  Any descriptions and/or
quotations from recorded conversations come from draft, not
final, transcripts and summaries of those conversations.  At
various points in this affidavit, I have placed in brackets or
parentheses my understanding of what was being said during those
conversations.  My understanding is based on the contents and
context of what was said during those conversations and the
investigation as a whole, my conversations with cooperating
sources, my experience as a law enforcement officer, and the
experience of other law enforcement officers in this
investigation.

6.    This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrant and does not purport to set forth all of my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

### III.   SUMMARY OF PROBABLE CAUSE

7.    A Confidential Human Source ("CHS") working for law
enforcement paid kickbacks totaling approximately $30,320 to
RIOS and DIDIO, who the CHS said work at Robert Medical Center
("RMC"), on or about July 20, 2017, August 10, 2017, August 14,
2017, and September 18, 2017.   DIDIO and RIOS received the
kickbacks in exchange for referrals from RMF to American

Clinical Reference Laboratory ("ACRL"), a medical laboratory, for RMF patients to receive laboratory diagnostic services from ACRL, for which ACRL submitted claims to one or more federal health care programs.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   The Anti-Kickback Statute

8.   The Anti-Kickback Statute, codified in relevant part at Title 42, United States Code, Section 1320a-7b(b)(1), prohibits knowing and willful solicitation or receipt of any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.

9.   For purposes of the Anti-Kickback Statute, "federal health care program" means: (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5); or (2) any State health care program, as defined in 42 U.S.C. Section 1320a-7 (h).  See Title 42, United States Code, Section 1320a-7b(b)(1).

B.   Description of the Medicare Program

10.   Medicare is a federally funded health care benefit program administered by the Centers for Medicare and Medicaid Services ("CMS") that provides reimbursement for certain medically necessary health care services, including laboratory diagnostic testing services, to persons age 65 and above and to certain disabled persons.

11.   Individuals who qualify for Medicare benefits are referred to as "beneficiaries."

12.   Persons and entities that provide medical services that are reimbursed by Medicare are called Medicare "providers."

13.   Medicare reimburses providers for certain types of medically necessary treatment, including laboratory diagnostic testing services performed by qualified providers.

14.   Medicare is a "federal health care program," for purposes of Title 42, United States Code, Section 1320a-7b(b)(1).

C. Description of the Medi-Cal and Family PACT Programs

15.   Medi-Cal is a state medical assistance program that pays the cost of essential medical care for low-income California residents.   Medi-Cal patients ("beneficiaries") do not receive health care directly from the Medi-Cal program.   Instead, independent health care providers enroll with

the Medi-Cal program, provide services to beneficiaries, and submit claims to Medi-Cal for services rendered.

16.  Medi-Cal reimburses providers for covered services, including certain laboratory diagnostic testing.

17.  Family PACT (Planning, Access, Care, and Treatment) is a program that provides comprehensive family planning services for low-income California residents who may not be eligible for these services under Medi-Cal.  Family planning services include pregnancy testing, birth control services, and medical services to ensure reproductive health, such as the diagnosis and treatment of sexually transmitted diseases.  These services include diagnostic services, such as laboratory testing.

18.  Family PACT is reimbursed under the Medi-Cal program. However, unlike under Medi-Cal, under Family PACT, the provider, not the state, determines the eligibility of the patients at the time of their visit.  Also unlike Medi-Cal, Family PACT patients are not required to provide Social Security numbers or Medi-Cal identification cards when applying for the services.

19.  Based on information provided by a Special Agent for the California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse ("Cal-DOJ BMFEA"), I know that these differences make the Family PACT program particularly susceptible to fraud, because without verifiable information such as a Medi-Cal number or Social Security number, providers can easily fabricate

patient information and bill Medi-Cal for non-existent patients or services.

20.    Medi-Cal and Family PACT are "federal health care program[s]," for purposes of Title 42, United States Code, Section 1320a-7b(b)(1).

### D. Background on the Confidential Human Source

21.    On June 15, 2017, Confidential Human Source ("CHS") was arrested pursuant to an arrest warrant and complaint for violations of the Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b)(b).  CHS waived initial appearance and agreed to cooperate with law enforcement.

22.    CHS is cooperating with the hope that his/her cooperation will be considered in any charging decisions made against him/her and, if s/he is charged and convicted of a crime, by a court at the time of sentencing.  The government has not made any promises or assurances to CHS in connection with this investigation.

23.    CHS's criminal history also includes a 2006 arrest for grand theft and a 2006 conviction for theft.  CHS was sentenced to 36 months' probation.  In 2012, CHS was detained for allowing the unlicensed operation of a vehicle, but no charges were filed.

24.    Following the June 15, 2017 arrest, at the direction of law enforcement, CHS made in-person and telephonic recordings

involving the subject of this complaint and other individuals. Information provided by CHS has been corroborated by law enforcement.

### E. Background on American Clinical Reference Laboratory

25.   American Clinical Reference Laboratory ("ACRL") is a medical laboratory in Walnut, California.  ACRL receives referrals for laboratory testing from various medical providers. Referring providers submit to ACRL a patient specimen, such as blood or urine, along with a requisition that details the testing to be performed.  ACRL performs the requested tests using the submitted specimen, and remits the results of the testing to the referring provider.  ACRL bills and receives payment for its services from various sources including direct patient payment ("cash pay"), private insurance, Medicare, traditional Medi-Cal, and Family PACT Medi-Cal.

26.   CHS is one of the owners of ACRL.  CHS and other individuals associated with ACRL paid kickbacks to individuals associated with medical providers in exchange for laboratory referrals to ACRL.

### F. Training and Experience Regarding Kickbacks

27.   Based on my training and experience in health care fraud investigations, I am unaware of a legitimate business reason why an individual associated with a medical clinic, such

as RMC, would receive routine, cash payments from the owner of a laboratory, such as ACRL.

28.  Based on my training and experience, I know that, because individuals involved in kickback schemes know that their activities are illicit, they often attempt to conceal or otherwise limit the knowledge of individuals who are uninvolved in the scheme, such as co-workers or law enforcement.

a.  Based on my training and experience, I know that one way in which individuals attempt to conceal their involvement in kickback schemes is to use cash as the preferred method of payment.  This is because cash payments do not leave the same forensic trail as other methods of payment, such as checks, bank account transfers, or credit cards, which could later be used to show kickback payments between parties.

b.  Based on my training and experience, I know that another way in which individuals attempt to conceal their involvement in kickback schemes is to conduct in-person exchanges, involving only the parties to the payment. Additionally, those individuals may choose to conduct the exchange away from their associated business locations.  In so doing, the individuals involved in the kickback scheme limit the opportunity for others to witness and potentially identify the kickback scheme.

### G. CHS Paid Kickbacks to RIOS and DIDIO for Referrals from RMC

29.   In June 2017, CHS provided law enforcement with a printed list of ACRL's accounts, which included medical clinics with which ACRL had kickback arrangements.  One of these accounts was Robert Medical Center ("RMC") in Bellflower, California.

30.   CHS said that CHS had been paying kickbacks for laboratory referrals from RMC for approximately two to three years.

31.   According to CHS, CHS used monthly Activity Reports generated from ACRL's billing system to calculate the periodic kickback payments for RMC's laboratory referrals to ACRL.  I have reviewed several of CHS's Activity Reports and I know that Activity Reports contain a summary of ACRL's activities for a selected client (clinic) over a specified time period. Information within the Activity Reports includes the referring provider (e.g., doctor); patient identifiers and tests run for the patient; the billings attributable to the tests; and the type of insurance billed (e.g., Medicare, Medi-Cal, HMO, etc.). According to CHS, the kickback payments for RMC's referrals were based on a flat kickback of $30 per patient referred by RMC. Based on my review of the Activity Reports, I know that most of the labs sent from RMC were for Family PACT testing.

32.   CHS identified DIDIO as the boss and administrator of RMC, and RIOS as a medical assistant at RMC.   Law enforcement agents searched the California Department of Motor Vehicles ("DMV") database for RIOS and DIDIO and obtained photographs of each.   I have viewed the DMV photograph of RIOS and compared it to video surveillance recorded by CHS during kickback payments, and the person CHS paid kickbacks to appears to be the same person in RIOS' DMV photograph.   I have also viewed the DMV photograph for DIDIO and I showed the photograph to CHS.   CHS said the person in the photograph is the same person CHS identified as DIDIO.   CHS also provided law enforcement agents with a business card for DIDIO, which indicated that DIDIO is the Administrator.   CHS said that DIDIO usually sent RIOS to receive the kickback payments from CHS.

### a. Kickback Payment on July 20, 2017

33.   On or about July 20, 2017, CHS conducted a recorded, in-person meeting with RIOS to make a periodic kickback payment for prior laboratory referrals from RMC to ACRL.   CHS told law enforcement that CHS and RIOS had arranged to meet in a Fry's Electronics store in City of Industry, California.   Based on my participation in this investigation, including my participation in surveillance, debriefing of CHS, and reviewing recordings made by CHS, I know the following facts about this meeting:

     a.   CHS met RIOS inside the store, and the two had a brief conversation before making the exchange.  During the conversation, CHS asked RIOS, "What happened to Gary [DIDIO]?," and RIOS replied, "He said that it's better if you and me [meet] most of the time because we've known each other for so long. And if they ask why I'm meeting you, stuff like that, you could tell—we could talk about personal stuff.  Our plans.  Stuff like that."

     b.   I understood this portion of the conversation to mean that DIDIO preferred that RIOS meet with CHS to obtain the kickback, because if RIOS and CHS were ever questioned about why they were meeting, they could explain that they were longstanding acquaintances who were talking about personal matters.  I believe that this, along with other information set forth herein, shows that DIDIO and RIOS were attempting to disguise the purpose of the meetings with CHS, because they knew that their kickback arrangement with CHS was illegal.

     c.   Based on CHS's statements to law enforcement and my review of recordings CHS made, I know that during the meeting inside the Fry's Electronics store, CHS handed RIOS a manila file folder, which CHS had folded to conceal an envelope that contained approximately $9,960 in cash, stapled into nine bundles of $1,000 each, and one bundle of $960.  When CHS handed

RIOS the envelope, CHS told RIOS, "So, anyway, it's nine thousand, nine hundred, sixty."

d.  I believe that CHS's comment to RIOS shows that RIOS knew the dollar amount of the kickback that she was receiving, despite the fact that the money was concealed in the manila file folder and envelope.

### b. Kickback Payment on August 10, 2017

34.  On or about August 10, 2017, CHS conducted a recorded, in-person meeting with RIOS to make a periodic kickback payment for prior laboratory referrals from RMC to ACRL.  CHS and RIOS arranged to meet for the exchange in the parking lot of a Fry's Electronics store in City of Industry, California.  Based on my participation in this investigation, including my participation in surveillance, debriefing of CHS, and reviewing recordings made by CHS, I know the following facts about this meeting:

a.  CHS and RIOS met in CHS's car to conduct the exchange.  Based on CHS's statements to law enforcement and my review of recordings CHS made, I know that CHS handed RIOS a catalog, which CHS had prepared to conceal an envelope that contained $9,000 in cash, stapled in nine bundles of $1,000 each.

b.  During the exchange, CHS and RIOS had a brief conversation about DIDIO, and then CHS told RIOS, "Okay, that is nine because I counted only up to yesterday because I didn't go

through the—I was starting from—I was coming from LA and I
didn't go to the office today.  So I said, well that's—there's
extra there for up to yesterday but that's $9,000 in there."
RIOS responded, "Okay, I'll tell him."

      c.   Later in the conversation, RIOS and CHS had the
following exchange:

RIOS:     "Mine's is there also?"

CHS:      "Uh-huh."

RIOS:     "A thousand?"

CHS:      "Yeah, yeah, yeah."

RIOS:     "Yeah? Oh okay.  I'll get that."

CHS:      "In other words, give Gary his eight and you take
            the one because that's nine."

RIOS:     "Oh okay."

CHS:      "And then the rest whatever is the balance then
            we'll just have to settle it the next time."

      d.   Based on my review of the Activity Reports,
information provided by CHS, and other facts set forth herein, I
believe that the above conversation is an explanation by CHS to
RIOS of the status of the accounting and reconciliation of the
kickbacks paid in exchange for referrals from RMC, and that RIOS
intended to pass this information along to DIDIO.  I also
believe that this conversation shows that RIOS and DIDIO acted

in concert to receive kickbacks, and shared the proceeds of the kickback arrangement with ACRL.

### c. Kickback Payment on August 14, 2017

35.   On or about August 14, 2017, CHS conducted a recorded, in-person meeting with RIOS to make a kickback payment for prior laboratory referrals from RMC to ACRL.  CHS told law enforcement that CHS and RIOS had arranged to meet for the exchange in the parking lot of a Staples store in Monterey Park, California. Based on my participation in this investigation, including my participation in surveillance, debriefing of CHS, and reviewing recordings made by CHS, I know the following facts about this meeting:

a.   CHS and RIOS met in CHS's car to conduct the exchange.  Based on CHS's statements to law enforcement and my review of recordings CHS made, I know that CHS handed RIOS an envelope, which contained approximately $1,360 in cash.

b.   During the meeting, CHS and RIOS had the following conversation:

RIOS:     "No, [with Gary]—right now I have to go deposit this into his account.  And then he just got me all over the place."

CHS:      "The thing is that I wasn't able to go to the lab because I was sick last Saturday[…]And what I'm

doing, I did not include [Friday], but that is up to Thursday."

RIOS:       "To Thursday?  Okay."

CHS:        "So you have one day left."

RIOS:       "Oh, Okay."

      c.    Based on my review of the Activity Reports, information provided by CHS, and other facts set forth herein, I believe that the above conversation was an update by CHS to RIOS on the status of the accounting and reconciliation of the kickbacks paid in exchange for referrals from RMC.  I also believe that this further establishes that DIDIO knew about and shared in the proceeds of the kickback arrangement with ACRL, based on the understanding that RIOS' comment related to depositing the kickback from the meeting into DIDIO's account.

      d.    Later during the same meeting in the Staples parking lot, CHS and RIOS had the following conversation:

CHS:        "Yeah, I was just thinking there seems–I think there's too much. So what do you think?"

RIOS:       "With Gary? Yes. He's–"

CHS:        "Well as long as the patients are there it's fine."

RIOS:       "Yeah, the patients is no problem."

16

CHS:        "But it's just that it seems like it's-I'm having 400 in one month. It would really be-I think-I don't know."

RIOS:       "I'll talk to him again because I keep telling him-"

CHS:        "It has to be on a regular basis that you might become a target later on, who knows? Nobody knows. So just give it a thought."  "Me, I like it of course because there's more. But sometimes they get worried because your load right now is really high. And, you know, like it's-"

RIOS:       "Oh, yeah."

CHS:        "So that will be - well think about it anyway.

RIOS:       "Yeah. I will. And I'll talk to him when he come back also."

     e.    Based on this discussion, information provided by CHS, and my training and experience in other health care fraud investigations, I understood that CHS was cautioning RIOS that RMC's volume of referrals to ACRL was too high, and that this could cause them to become a "target."  I understood from RIOS' responses that she shared CHS's concern, that she had previously expressed this concern to DIDIO, and that she intended to raise the issue again with DIDIO.  I believe that this conversation shows that RIOS did not wish for RMC to become a "target" based

17

on its volume of referrals related to the kickback arrangement
with ACRL, and that DIDIO was involved in controlling the number
of referrals from RMC to ACRL.

### d. Kickback Payment on September 18, 2017

36. On or about September 18, 2017, CHS conducted a
recorded, in-person meeting to make a periodic kickback payment
for prior laboratory referrals from RMC to ACRL. CHS told law
enforcement that CHS had arranged to meet with DIDIO and RIOS
for the exchange at RMC's office in Bellflower, California.
Based on my participation in this investigation, including my
participation in surveillance, debriefing of CHS, and reviewing
recordings made by CHS, I know the following facts about this
meeting:

a. CHS entered the lobby of RMC's office and asked
for DIDIO. After a short delay, RIOS came into the lobby from
the office area and instructed CHS to come with her. RIOS
walked out of the office and CHS followed RIOS to her car. Once
RIOS and CHS were inside her car, RIOS began driving in the
neighborhood around the clinic. RIOS explained to CHS that
DIDIO monitored the security cameras at the clinic using his
phone, and that he saw a white truck and a van in the area of
the clinic that were not familiar to him. Because of this,
DIDIO instructed RIOS to take CHS with her and "tell [CHS] to
give it to you," and that DIDIO would talk to CHS by phone after

he left the office.  RIOS repeated that "What he [DIDIO] wants is for you to leave it with me."  CHS asked, "So you want me to give it to you now?" to which RIOS answered, "Yes."  Based on CHS's statements to law enforcement and my review of recordings CHS made, I know that CHS handed RIOS an envelope that CHS prepared containing $10,000 in cash, stapled into ten bundles of $1,000, each.  CHS told RIOS, "Here, that's ten thousand, okay?" to which RIOS responded, "Okay."  While CHS was in the car with RIOS, CHS saw DIDIO, who was driving another vehicle, pull alongside RIOS' car.  During the drive, RIOS remarked, "So, he's thinking they're following us."  RIOS also told CHS that DIDIO "used to be one of those people who hurt people cause you owed people money" as a reason for why DIDIO was paranoid.  After receiving the kickback payment from CHS, RIOS said that she would drop CHS on the corner, and that CHS could walk to CHS's car from there.

   b.  Law enforcement conducted surveillance of the September 18, 2017, meeting at RMC and saw the following:

     i.  A white Volkswagen determined to be registered to Felipe Rios (the "Volkswagen").

     ii.  A beige Chevy Tahoe determined to be registered to Michelle DiDio/Gary DiDio (the "Chevy").

     iii. CHS entered the front door of RMC at approximately 4:53 p.m.

iv.   CHS and RIOS left RMC at approximately 4:55 p.m., entered the Volkswagen, and left the RMC parking lot with RIOS driving and CHS in the front passenger seat.

v.   DIDIO left RMC at approximately 4:56 p.m., got into the Chevy, and left the RMC parking lot in the same direction as RIOS and CHS.

vi.   The Chevy followed the Volkswagen and the two cars circled the block in tandem at approximately 4:57 p.m.

vii.   The Volkswagen stopped at the curb near the RMC office and CHS got out and walked back to his/her vehicle at approximately 5:00 p.m.

viii.   At approximately 5:05 p.m., the Chevy pulled over at the curb behind the Volkswagen near where CHS had been dropped off.  DIDIO got out of the Chevy, walked up to the Volkswagen, and spoke briefly to RIOS.  DIDIO was handed a white envelope and placed the envelope in his front left pocket.  This envelope was similar in shape and size to the envelope containing $10,000 that CHS prepared before the meeting.

ix.   The Chevy drove up and down Oak Street, and eventually parked back in the parking lot of RMC at approximately 5:13 p.m.

c.   During the surveillance, law enforcement cars included a white truck and a van, which matched the descriptions

of the cars that RIOS told CHS that DIDIO had seen by using the clinic's surveillance cameras.

37.   Based on the above information, my review of ACRL Activity Reports, information provided by CHS, and Medicare and Medi-Cal claims data reviewed by other agents involved in this investigation, I believe that ACRL billed one or more federal health care programs for referrals from RMC for which kickbacks were paid by CHS to RIOS and DIDIO

## V. CONCLUSION

38.   For all the reasons described above, there is probable cause to believe that RIOS and DIDIO violated Title 42, United States Code, Section 1320a-7b(b)(1)(A) (illegal remunerations).


JEREMY THORNTON
Special Agent
US Department of Health and
Human Services,
Office of Inspector General


Subscribed to and sworn before me
This 6th day of November 2017.


HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE